**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

JOSEPH PHILLIP HARRIS,

Plaintiff,

v.

WELLS FARGO BANK, N.A., HANG SENG
BANK LTD., TIEN PHONG COMMERCIAL
JOINT STOCK BANK, VIETNAM
TECHNOLOGICAL AND COMMERICAL; TU
CHUONG NIEM; and TRELLIAN PTY.
LIMITED,

Defendants.

No. _____

**COMPLAINT AND**
**JURY TRIAL DEMANDED**

Plaintiff Joseph Philip Harris ("Plaintiff"), by and through his counsel of record, as and for

his complaint against Wells Fargo Bank, N.A. ("Wells Fargo"), Hang Seng Bank Ltd. ("Hang

Seng"); Tien Phong Commercial Joint Stock Bank ("TPB"); Vietnam Technological and

Commercial ("Techcombank"); Tu Chuong Niem ("Niem") and Trellian Pty. Limited ("Trellian")

allege as follows:

## INTRODUCTION

1.    Cryptocurrency fraud scams such as pig butchering have emerged as a multibillion-

dollar criminal specialty that has entrapped victims around the world.[1] Plaintiff is one of those

---

[1] *See* Wilson, Tom *How "pig butchering" scams have emerged as a billion-dollar crypto industry*, REUTERS (Dec.
8, 2023), https://www.thomsonreuters.com/en-us/posts/investigation-fraud-and-risk/pig-butchering-scams/. "Such
pig-butchering scams — so called because the unsuspecting victim of the scam (the pig) is tricked by scammers into
forking over money for a promised big return — have drawn intensifying scrutiny from global law enforcement over
the past year, but little is publicly known about the people behind them." *Id.*

victims.

2.      A fraudster contacted Plaintiff and presented a purported investment opportunity in crypto used to fund purchases of gold. The fraudster persuaded Plaintiff to wire funds from his accounts at Wells Fargo and Chase to accounts at Hang Seng, TPB, and Techcombank under the guise of investing in gold.

3.      Unbeknownst to Plaintiff, these funds were never invested in gold or gold futures contracts. This is because the recipients of his funds were fraudulent companies from the start. On information and belief, the sums were unlawfully diverted to other third-party accounts for unauthorized use.

4.      Fuex Group Ltd. (through Niem) extracted hundreds of thousands of dollars from Plaintiff and perpetrated a fraud against him.

5.      Defendant Trellian hosted the clandestine Fuex website and earned ill-gotten revenue not only from hosting fees but also from each "click" made by its victims in the United States and elsewhere, including but not limited to Plaintiff.

6.      Hang Seng, TPB, and Techcombanks' complete failure to comply with relevant know-your-customer and anti-money laundering ("KYC/AML")[2] laws when opening accounts for the fraudster amounted to substantial assistance to the fraudster's fraud and willful blindness to the fact that their business activities were criminal and fraudulent. A simple review of the accountholders would have revealed a complete lack of credible evidence that their business activities were lawful or legitimate. Their decision to bury their heads in the sand and refuse to

---

[2] The Financial Crimes Enforcement Network recently assessed a record $1.3 billion penalty against TD Bank, N.A. and TD Bank USA, N.A. for violations of the Bank Secrecy Act because the entities allowed their AML programs to languish, making TD Bank a target for illicit actors. *See FinCEN Assesses Record $1.3 Billion Penalty against TD Bank*, Financial Crimes Enforcement Network (Oct. 10, 2024), https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank.

conduct any due diligence to verify the identity of their potential new customers amounts to aiding and abetting fraud.

## THE PARTIES

7.     Plaintiff is an individual who resides in West Des Moines, Iowa.

8.     Defendant Wells Fargo Bank, N.A. is an American bank organized under the laws of California and maintains its principal offices at 420 Montgomery Street, San Francisco, CA 94104. Wells Fargo maintains ATMs and banking locations throughout Iowa.

9.     Defendant Hang Seng Bank Ltd. is a Hong Kong SAR People's Republic of China entity with a principal place of business at 83 Des Voeux Rd. Central, Hong Kong SAR People's Republic of China.

10.     Defendant Tien Phong Commercial Joint Stock Bank is a Vietnamese bank with a principal place of business at TP Bank Building No. 57, Ly Thuong Kiet Street Tran Hung Dao Ward Hoan Kiem District, Hanoi, Vietnam.

11.     Defendant Vietnam Technological and Commercial Bank is a Vietnamese bank with its headquarters at No. 6 Quang Trung Street, Hoan Kiem District, in Hanoi, Vietnam.

12.     Defendant Tu Chong Niem is an individual who, on information and belief, resides in Elk Grove, California. Niem was the purported director and controlling person of Fuex Group Limited, a foreign corporation that was based in the United Kingdom with a principal address of Unit G1, Capital House 61 Amhurst Road London, United Kingdom and dissolved on August 22, 2023. The purported nature of Fuex's business was information technology consultancy activities.

13.     Defendant Trellian is a technology company based in Melbourne, Australia with subsidiary operations in South Asia, the United States and elsewhere. At all times relevant to this proceeding and to this day despite the dissolution of Fuex, Trellian hosts the website for Fuex from

its server in Beaumaris, Victoria, Australia.  See ***Exhibit "1"*** annexed hereto.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of the State of Iowa. All defendants are either citizens of California or non-citizens of the United States.

15.    This court may exercise specific jurisdiction over Defendants because their role in perpetuating and/or assisting the fraud against Plaintiff constituted an injury to Plaintiff in this jurisdiction, thus rendering the exercise of jurisdiction by this Court proper and necessary.

16.    Venue is proper in the Southern District of Iowa because a substantial part of the acts or omissions giving rise to the claim occurred in this district. 28 U.S.C § 1391(b)(2).

## FACTUAL BACKGROUND

17.    Hang Seng, TPB, and Techcombank are financial institutions subject to KYC/AML regulations that require establishing proof of an account holder's legal identity to identify suspicious transactions and prevent fraud.

18.    KYC regulations are part of the federal Anti-Money Laundering ("AML") laws. The Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq.,* applies to (i) U.S. branches of foreign financial institutions operating within the U.S.; (ii) non-U.S. operations of foreign financial institutions due to their relationships with their U.S.-based operations, particularly through correspondent banking relationships; and (iii) financial institutions operating exclusively outside the US if their transactions are processed through a U.S. financial institution, or if U.S. sanctions affect the financial institutions or the countries in which they operate.[3]

---

[3] "As FinCEN has shown on previous occasions, foreign operating financial institutions are well within its authority as promulgated under the BSA and the USA PATRIOT Act." Stan Sater, *Do We Need KYC/AML: The Bank Secrecy Act and Virtual Currency Exchanges*, 73 Ark. L. Rev. 937 (2020) (citing *United States v. Budovsky*, No. 13cr368 (DLC), 2015 WL 5602853, at 7 & n.5 (S.D.N.Y. Sept. 23, 2015).

19.     Thus, the BSA applies to Hang Seng, TPB, and Techcombank because transactions with Plaintiff and others Americans were processed through U.S. institutions, in this case Wells Fargo and Chase, where Plaintiff maintained the accounts from which wire transfers were issued. *See* 31 U.S.C. § 5312.

*20.*     All financial institutions subject to FinCEN regulations are required to maintain risk-based AML programs. *See* 31 C.F.R. §§ 1010-1020. A February 2012 report by the Financial Action Task Force (FATF), an intergovernmental organization created by the G7 to develop AML policies, discusses how countries and the banking institutions they regulate should identify, assess, and understand money laundering and terrorist financing risks, and then take action to apply resources to effectively mitigate those risks in ways commensurate with the risks identified. A copy of FATF is annexed hereto as ***Exhibit "2".***

21.     With respect to customer due diligence, FATF advises that financial institutions as an established industry practice should be required to undertake due diligence when (i) establishing business relations; (ii) carrying out occasional transactions above the designated threshold of USD/EUR 15,000 or certain wire transfers; (iii) there is a suspicion of money laundering or terrorist financing; *or* (iv) the financial institution has doubts about the veracity or adequacy of previously obtained customer identification data. *Id.* at p. 14 (emphasis added).

22.     As per FATF, banking industry standards for customer due diligence include, among other things, (a) identifying the customer and verifying that customer's identity using reliable, independent source documents, data or information; (b) identifying the beneficial owner of such entities, and taking reasonable measures to verify the identity of the beneficial owner, such that the financial institution is satisfied that it knows the beneficial owner. That is, for legal persons and arrangements, financial  institutions are to understand the ownership and control structure of

the customer; (c) understanding and, as appropriate, obtaining information on the purpose and intended nature of the business relationship; and (d) conducting ongoing due diligence on the business relationship and scrutiny of banking transactions undertaken throughout the course of that relationship to ensure that those transactions are consistent with the institution's knowledge of the customer, their business and risk profile, including, where necessary, the source of funds. *Id.*

23.    The BSA further establishes an array of anti-money laundering procedures and practices which mandate the tracking and reporting of all bank transactions that are over a certain dollar amount and that exhibit certain suspicious characteristics. To this end, Wells Fargo employs multiple sophisticated systems and processes designed to identify suspicious transactions. Wells Fargo also launched the Elder Client Initiatives Center of Excellence in 2019, focused on protecting elder clients from financial abuse.[4]

24.    Hang Seng, TPB, and Techcombank are lawfully required to have new customers provide certain personal identity documentation when opening an account. The documents required are part of formal customer identification programs that require identification and verification of their customers' identities to combat money laundering and other illegal activities.

25.    While not subject to banking regulations, Trellian—as a front-line defense against fraudsters and under commonly accepted conduct of technology providers to financial services institutions—was to have performed at least a modicum of diligence to confirm (a) the bonafides of Fuex, (b) purported owners of Fuex and (c) the source of funds used by Fuex to pay Trellian for its services. Given that Trellian continues to host the clandestine Fuex website to this day, it has

---

[4] *See Wells Fargo Creates Elder Client Initiatives Center of Excellence Led by Ron Long*, Wells Fargo (Apr. 8, 2019), available at https://newsroom.wf.com/English/news-releases/news-release-details/2019/Wells-Fargo-Creates-Elder-Client-Initiatives-Center-of-Excellence-Led-by-Ron-Long/default.aspx.

never performed any diligence of any kind whatsoever on Fuex, who was paying for hosting services for Fuex and from where "clicks" on the website were originating.

26.    Once the clandestine Fuex website was "live," its fraudster(s) contacted Hang Seng, TPB, and Techcombank to open accounts to receive fraudulently-obtained proceeds from pig-butchering activities.

27.    Account opening documents go through a verification process, and Hang Seng, TPB, and Techcombank were expected to inquire of the fraudsters at Fuex as to the nature of their businesses' activities, the purpose of the accounts, and anticipated type and currency value of financial transactions of these customers.

28.    Because they were required to do so, upon receipt of the documents, Hang Seng, TPB, and Techcombank should have required the signatory on the accounts to physically appear to review and verify the documents and the account signatory's true identity.

29.    The business account manager at the local branch of each of the Hang Seng, TPB, and Techcombank branches either (1) failed to realize there were material discrepancies and irregularities in accountholder's documents and/or (2) realized there were discrepancies and irregularities in the documents, but acted with deliberate indifference and assisted the fraudulent actor in opening the account, each because of the incentives Hang Seng, TPB, and Techcombank have in place for Account Managers to open business accounts.

30.    It is believed Hang Seng, TPB, and Techcombank had in place a practice of willful blindness and deliberate indifference to avoid the complexities and responsibilities associated with addressing these issues as to preserve transaction-related revenues from such suspicious accounts. Here, Hang Seng, TPB, and Techcombank drew a blind eye toward illicit proceeds moving from

the United States to a plethora of Asian parties and assisted in the extraction of hundreds of thousands of dollars, if not millions, in another pig butchering scam.

31.    Hang Seng, TPB, and Techcombank knew there were no legal purposes associated with setup of the fraudsters' accounts. Hang Seng, TPB, and Techcombank could have easily conducted basic reviews of these entities' corporate documents and called their offices, which would have revealed the fraud.

32.    Instead, the fraudster(s) co-opted the credibility of Hang Seng, TPB, and Techcombank to imply AML/KYC procedures were being conducted when in fact they were not.

33.    Despite actual and/or constructive knowledge that the fraudsters' accounts were opened for fraudulent purposes without any legitimate business purposes, Hang Seng, TPB, and Techcombank continued to maintain the accounts and thus enabled victims like Plaintiff to wire funds to them who relied on the business character and repute of supposedly compliant banking institutions.

34.    Plaintiff is a seventy-five-year-old college professor.

35.    In approximately June 2023, a fraudster(s) operating under the name Violane Chen a/k/a Xinyi Deng first contacted Plaintiff via LinkedIn and WhatsApp in what discovery will reveal to be a mass electronic communications trolling operation for butchering targets. Ms. Deng, who was told by Plaintiff that she resided in Iowa, presented to Plaintiff an alleged investment opportunity in gold and gold futures contracts (funded by crypto). Ms. Deng claimed her uncle owned Defendant firm Fuex. Ms. Chen recommended he start investing in gold and gold futures by opening an account with Fuex.

36.     Knowingly communicating with Plaintiff in Iowa, Ms. Chen made numerous representations that she was both a limited partner and investor in Fuex, and provided Plaintiff with materials and statements to determine whether investment via Fuex was suitable for him.

37.     Plaintiff was compelled to invest due to Ms. Chen's assurances of significant returns.

38.     Prior to encountering the fraudster, Plaintiff maintained an account with Defendant Wells Fargo since 1989. As part of that banking relationship, Plaintiff agreed to be bound by the terms of Wells Fargo's Deposit Account Agreement. A copy of that Agreement is attached as ***Exhibit "3"*** annexed hereto.

39.     Plaintiff never sent a wire transfer abroad before and never knew he could wire transfer money abroad. Plaintiff liquidated his retirement funds at TD Ameritrade, used proceeds from a loan, and transferred funds to his Wells Fargo account to wire transfer, and later opened an account at Chase Bank to send his final wire transfers.

40.     Prior to making these wires, the fraudster instructed Plaintiff to lie about the purpose of the wire transfer (investment in gold future contracts) and offer less-suspicious reasons for the wire, like sending money to a friend who needed help, or purchasing business equipment.

41.     On June 2, 2023, Plaintiff executed a wire transfer of $1,500.00 via Wells Fargo to an account held by Ouyang Panfei at Hang Seng.

42.     On June 15, 2023, Plaintiff executed a wire transfer of $15,000.00 via Wells Fargo to an account held by Wei Sicheng at Hang Seng.

43.     Rather than restrict wire activity from Plaintiff's account after these first two wires and in contravention of its undertakings to protect its elderly clientele, Wells Fargo gave him an "RMA Security Key" ("RMA") after his first two wires. This RMA is a physical device that

enabled Plaintiff to make wire transfers whenever he wanted from home without going into the bank. With the RMA device, there was no verification over the phone or e-mail by Wells Fargo. Plaintiff could type in the amount, recipient, wire number, etc., and make the wire transfer immediately with this device.

44.    Wells Fargo suggested that he get the RMA device after Plaintiff stated he disliked having to travel one hour each way to the bank every time he wanted to effectuate a wire transfer.

45.    On June 21, 2023, Plaintiff executed a wire transfer of $25,000.00 via Wells Fargo to an account held by Tnhh Cong Nghe Lisui at TPB.

46.    On June 22, 2023, Plaintiff executed a wire transfer of $85,000.00 via Wells Fargo to an account held by Tnhh Cong Nghe Lisui at TPB.

47.    On July 10, 2023, Plaintiff executed a wire transfer of $230,000.00 via Wells Fargo to an account held by Cong Ty Tnhh Thuong Mai Landy at TPB.

48.    On July 25, 2023, Plaintiff executed a wire transfer of $50,000.00 via Wells Fargo to an account held by Tnhh Cong Nghe Lisui at Techcombank.

49.    On July 28, 2023, Plaintiff executed wire transfer of $15,000.00 via Wells Fargo to an account held by Cong Ty Tnhh Thuong Mai Everlon at TPB.

50.    On August 17, 2023, Plaintiff executed wire transfer of $95,000.00 via Wells Fargo to an account held by an unknown account holder at Techcombank.

51.    At all relevant times, Tnhh Cong Nghe Lisui, Cong Ty Tnhh Thuong, and the unknown accountholder were agents and/or alter egos of the fraudster Ms. Chen and Defendant Niem (acting through Fuex).

52.    At no time did Wells Fargo ever ask Plaintiff additional questions, such as why his friend who needed help in Vietnam required more than the equivalent of what an average person in Vietnam earns over the course of their entire lifetime sent to several different people.

53.    Sometime in September 2023, Plaintiff opened an account with Chase Bank to continue wire transferring money to the fraudster. On September 9, 2023, Plaintiff executed a wire transfer of $199,712.00 via Chase Bank to an account held by an unknown account holder at Techcombank.

54.    Plaintiff believed these wire transfers were used to fund transfers of cryptocurrency from crypto.com into an account at Fuex (controlled by defendant Niem). His Fuex account number ended in #0718. Fuex's website purported to fund purchases of gold with crypto. Ms. Chen also represented to Plaintiff that she was matching his investment amount.

55.    After effectuating these transfers, Plaintiff used the online platform located at fuexweb.net hosted by Trellian to view the returns on his investment. Inexplicably, Trellian continued to host the Fuex website after Fuex was dissolved.

56.    Plaintiff thereafter discovered the fraud because he attempted to transfer funds out of his Fuex account back to his U.S. bank account. Plaintiff was met with baseless excuses from Fuex regarding lack of identity verification or that he did not have a valid extension request to have his funds returned. Ms. Chen then stopped responding to him.

57.    Upon discovery of the fraud, Wells Fargo attempted to retrieve funds that Plaintiff wired, but the beneficiary bank refused to provide them.

58.    Likewise, Chase requested a recall of the funds from Techcombank several times in September and October 2023 without success.

59.     Plaintiff is not the only victim of the particular fraudster. On information and belief, Ms. Chen scammed at least <u>one other</u> person who was interviewed in an article for CNBC.[5] As described in the article, the Fuex operation appears to be part of a "pig butchering farm" in Southeast Asia.

### COUNT I
### <u>FRAUD</u>
### (Against Defendant Niem)

60.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

61.     To the extent necessary, this cause of action is pled in the alternative.

62.     At all relevant, times, Fuex was an entity under the custody and/or control of the fraudster Ms. Chen and Defendant Niem. Tnhh Cong Nghe Lisui, and Cong Ty Tnhh Thuong were persons under the supervision or control of Niem and Ms. Chen.

63.     Ms. Chen induced Plaintiff to transfer the proceeds that were intended by Plaintiff to invest in gold purportedly held in an account with Fuex (controlled by Niem).

64.     The representations that the money would be used for gold investment in Fuex were false. They were not involved in investing at all and were improperly diverted by Ms. Chen after being deposited into fraudulent accounts she and/or her agents opened at Hang Seng, TBP, and Techcombank.

65.     Niem knew that these instructions were false and illegal.

66.     Niem intended that Plaintiff rely on the instructions, which he did in sending the fraudulent wires.

---

[5] *Rohan Goswami*, That simple 'hi' text from a stranger could be the start of a scam that ends up costing you millions, CNBC (May 2, 2023), https://www.cnbc.com/2023/05/02/pig-butchering-scammers-make-billions-convincing-victims-of-love.html.

67.    Plaintiff has been damaged by the conduct of the aforementioned Defendant.

**COUNT II**
**AIDING AND ABETTING FRAUD**
**(Against Defendants Hang Seng, TPB, Techcombank, Trellian)**

68.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

69.    To the extent necessary, this cause of action is pled in the alternative.

70.    Ms. Chen, Fuex, Tnhh Cong Nghe Lisui, and Cong Ty Tnhh Thuong perpetrated a fraud on Plaintiff and obtained the stolen proceeds.

71.    The fraudsters intended Plaintiff rely on the representations while purporting to offer a gold investment opportunity.

72.    Hang Seng, TPB, and Techcombank were aware that there was a high probability that Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong intended to defraud victims like Plaintiff because the accountholders did not provide any substantiation for purported lawful business activities they intended to conduct through the account at issue.

73.    Hang Seng, TPB, and Techcombank took deliberate action or inaction to avoid learning these facts by omitting to conduct KYC/AML procedures that would have prevented these entities from setting up a bank account(s) to defraud Plaintiff and likely others. Hang Seng, TPB, and Techcombank intended to remain ignorant to be able to abstain from taking affirmative action, because they receive incentives for opening new accounts.

74.    Hang Seng, TPB, and Techcombank rendered substantial assistance to Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong in perpetrating their fraud by (i) deliberately choosing to abstain from KYC/AML procedures prescribed in both the Bank Secrecy Act and intentional standards as set forth in the FATF that would have easily revealed the fraudulent nature of this

enterprise; (ii) taking no action upon learning that Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong used the bank accounts for illegal or improper purposes; (iii) disregarding proper protocol in the opening and/or maintenance of Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuongs' accounts; and (iv) permitting Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuongs' accounts to remain open despite its lack of proof of any legitimate business.

75.     Likewise, Trellian failed to request from Fuex any documentation of its capacity to lawfully conduct business in the jurisdictions where its website could be accessed, the bonafides of its business or who was paying hosting fees.

76.     Evidenced in part by its continued hosting of the Fuex website even after the company dissolved, Trellian took deliberate action or inaction to facilitate the Fuex fraud through failing to verify the (i) source of funds used to pay for web-hosting services, (ii) owners of Fuex, (iii) business of Fuex and (iv) licensure of Fuex in those jurisdictions where its website could be accessed.

77.     Such conduct amounts to Hang Seng, TPB, Techcombank, and Trellian assenting to the tortious conduct and lending their approval and assistance.

78.     Plaintiff has been damaged by the conduct of the aforementioned Defendants.

**COUNT III**
**CONVERSION/AIDING & ABETTING CONVERSION**
**(Against Defendants Hang Seng, TPB, Techcombank, and Trellian)**

79.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

80.     To the extent necessary, this cause of action is pled in the alternative.

81.     Plaintiff had a possessory right or interest in his funds transferred to Hang Seng, TPB, and Techcombank for purported cryptocurrency investment to fund the purchase of gold.

82.     Hang Seng, TPB, and Techcombank exercised dominion over Plaintiff's funds, in derogation of plaintiff's rights, and unlawfully diverted or knowingly or recklessly aided in the diversion of those funds for unauthorized use.

83.     Hang Seng, TPB, and Techcombank have refused to return Plaintiff's funds.

84.     Evidenced in substantial part by its continued provision of services to Fuex after its corporate dissolution, Trellian recklessly aided in the diversion of these funds through hosting a website for an unlicensed and later defunct financial institution bearing false financial information that was being accessed by Plaintiff and other customers of Fuex in the United States, thus providing the legitimacy and cover that the fraudsters required to execute their malevolent scheme.

85.     Plaintiff has been damaged by the aforementioned conduct.

**COUNT IV**
**<u>NEGLIGENCE</u>**
**(Against Defendants Hang Seng, TPB, and Techcombank)**

86.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

87.     To the extent necessary, this cause of action is pled in the alternative.

88.     FATF and the BSA stated above a standard of care Hang Seng, TPB, and Techcombank must ascribe to. This includes the duty to adhere to the requirements of KYC/AML laws and/or internal policies to prevent fraudulent accounts from being opened in the first place to perpetuate fraud with the bank's stamp of approval.

89.     Hang Seng, TPB, and Techcombanks' decision to turn a blind eye to vetting Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong instead of completing due diligence created a special relationship between Hang Seng, TPB, and Techcombank and Plaintiff, who faced an increased risk of harm as a result of Hang Seng, TPB, and Techcombanks' deliberate indifference. Plaintiff

was part of a foreseeable class of persons who would be harmed by fraudsters like Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong seeking to exploit Hang Seng, TPB, and Techcombanks' failure to conduct any due diligence.

90.     Hang Seng, TPB, and Techcombank breached the common law duty they owed to Plaintiff by failing to exercise reasonable care in their account opening and administration.

91.     Hang Seng, TPB, and Techcombank should have verified the identity of the accountholders. They apparently did neither or simply lacked the wherewithal and resources to comply with commonly accepted standards in the banking industry for AML/KYC and FATF mandates.

92.     Had Hang Seng, TPB, and Techcombank collected information on Tnhh Cong Nghe Lisui and Cong Ty Tnhhs' operations and institutions owned by or affiliated with Tnhh Cong Nghe Lisui and Cong Ty Tnhh, this information would have reasonably allowed for the detection and reporting of instances of suspicious activity and fraud through those accounts.

93.     By transferring money to an account opened without adhering to KYC/AML procedures and internal policies, Hang Seng, TPB, and Techcombank proximately caused Plaintiff to be damaged.

**COUNT V**
**BREACH OF CONTRACT**
**(Against Defendant Wells Fargo)**

94.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

95.     To the extent necessary, this cause of action is pled in the alternative.

96.     A banking institution's account agreement creates a contractual relationship between a bank and its customer.

97.     Implicit in this relationship is the duty to exercise reasonable or ordinary care in the performance of the contract, thereby allowing a bank customer to sue in contract for breach of that duty.

98.     Wells Fargo's Deposit Account Agreement is a binding contract that arose when Plaintiff opened his account with Wells Fargo. A copy of the Deposit Account Agreement is annexed hereto as *Exhibit "3."*

99.     By virtue of the Deposit Account Agreement, Wells Fargo owed Plaintiff a duty of "exercising ordinary care and complying with" the Deposit Account Agreement. The Deposit Account Agreement states: "When we take an item for processing by automated means, ordinary care does not require us to examine the item. In all other cases, ordinary care requires only that we follow standards that don't vary unreasonably from the general standards followed by similarly situated banks."

100.    The BSA/AML, FATF, the laws of Iowa, Wells Fargo's own policies and procedures, and customary banking practices establish that reasonable commercial standards in consumer banking require Wells Fargo to identify and investigate suspicious transactions by elderly customers and to intervene when that investigation yields evidence of financial exploitation or abuse. These heightened procedures to protect elderly customers from exploitation and abuse are fundamental elements of Wells Fargo's consumer banking operations and are incorporated into the duty of ordinary care Wells Fargo owes to its elderly banking customers.

101.    Plaintiff, an elderly consumer banking customer, liquidated massive amounts of his retirement funding and ordered seven large-dollar, round number wire transfers in quick succession that totaled over $600,000.00. These banking activities were in sharp contrast to the historical spending habits of this elderly customer who never before executed *any* wire transfers—

much less to banks in Vietnam—for quantities that represent enormous sums of money for a person living in Vietnam or operating a business there.

102.    When Plaintiff ordered each of the wire transfers at issue in this action, he offered purported justifications that are known to be used by fraudsters to effectuate wire transfer payments. Under the circumstances, reasonable or ordinary case required Wells Fargo to investigate the highly suspicious wire transfers further, freeze the account, and take the steps necessary to protect his assets.

103.    Instead, not only did Wells Fargo repeatedly ignore the red flags signaling Plaintiff was being defrauded and that his assets were in jeopardy, but it also gave Plaintiff an RMA security key device to execute six-figure transfers without any supervision or authorization by *any* Wells Fargo employee. This use of the security device defies standards that unreasonably vary from the general standards followed by similarly situated banks.

104.    Wells Fargo's failure to investigate and take protective action on numerous occasions constitutes breaches of its duty of reasonable or ordinary care and breaches of contract under the Deposit Account Agreement by repeatedly ignoring all indications that Plaintiff was being defrauded and that his assets were in jeopardy.

105.    Wells Fargo's failures to investigate and intervene to stop each of Plaintiff's wire transfers constitutes separate breaches of contract under the Deposit Account Agreement.

106.    Wells Fargo's acts of breach of contract have caused Plaintiff damages.

107.    Plaintiff has been damaged by the aforementioned conduct.

**COUNT VI**
**Unjust Enrichment**
**(Against All Defendants)**

108.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if set forth herein.

109.    To the extent necessary, this cause of action is pled in the alternative.

110.    Niem (through Fuex), Tnhh Cong Nghe Lisui, and Cong Ty Tnhh Thuong received the equivalent of $716,212.00 from Plaintiff under the guise that the funds would be used to invest in gold and gold futures contracts.

111.    Hang Seng, TPB, and Techcombank provided account services to Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong, and these accounts were used to carry out the fraud against Plaintiff.

112.    The funds held in the account belonged to investors, including Plaintiff.

113.    Plaintiff conferred benefits upon Tnhh Cong Nghe Lisui and Cong Ty Tnhh Thuong in the form of his fund transfers. Plaintiffs also conferred benefits upon Wells Fargo, Hang Seng, TPB, and Techcombank in the form of at least $716,212.00 of deposits from which Hang Seng, TPB, and Techcombank generated income, including, but not limited to, interest, transfer fees, service fees, transaction fees, and online banking fees.

114.    Wells Fargo, Hang Seng, TPB, and Techcombank knowingly and voluntarily accepted and retained the funds, deposits and/or those benefits.

115.    Likewise, Trellian received revenue and hosting fees for the unlawful Fuex website, and on information and belief continues to do so to this day.

116.    Because Niem received funds, benefits, and fees---despite the fact that Plaintiff's funds were never put to their intended use—it would be inequitable for him to retain the benefits

of the fund transfers made with Plaintiff's money. As to Hang Seng, TPB, and Techcombank, because their provision of banking services assisted Defendants in the fraud, it would be inequitable for Hang Seng, TPB, and Techcombank to retain the benefits they generated from Plaintiff's money.

117.    And for Wells Fargo, because of their failure to protect their own banking customer upon constructive notice of elderly financial abuse, it would be inequitable for Wells Fargo to retain the fee benefits it generated from Plaintiff's money.

118.    And for Trellian, it would be inequitable for it to retain the fees and revenue it derived from the unlawful operation of the Fuex website, the payments of which represent funds commingled with those of Plaintiff.

## PUNITIVE DAMAGES REQUESTED

119.    The collective conduct of Defendants was reckless to the point of being malicious, and as such diminishes the confidence that citizens of the State of Iowa have in the legitimacy of the global financial markets and banking system. Defendants must serve as an example that engaging with "pig butchers" or failing to take basic steps to identify them is not tolerated in Iowa. Plaintiff is thus entitled to punitive damages on those causes of action where such an award is permitted under Iowa Code § 668A.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief against the Defendants as follows:

1.    For any and all economic damages according to proof which at this time are believed to be in excess of $716,212.00;

2.    For special damages according to proof at trial;

3.     For any and all prejudgment interest, post judgment interest according to proof at trial;

4.     For attorney's fees and costs that are allowed by law;

5.     For punitive damages against Defendants in an amount to be determined according to proof at trial as permitted under Iowa Code § 668A.1 (1993); and

6.     For such other and further relief as the Court deems just and proper.


**DEMAND FOR JURY**

Plaintiff demands a jury trial for determination as to all causes of action as herein alleged.


Respectfully Submitted,

/s/ Thomas J. Duff
Thomas J. Duff
DUFF LAW FIRM, PLC
The Galleria
4090 Westown Pkwy, Suite 102
West Des Moines, Iowa 50266
Telephone: (515) 224-4999
Fax: (515) 327-5401
Email : jim@tdufflaw.com
        tom@tdufflaw.com
        wendy@tdufflaw.com


*/s/ Robert V. Cornish, Jr.*
ROBERT V. CORNISH, JR. (*pro hac vice*
to be filed)
Email: rcornish@rcornishlaw.com
680 South Cache Street, Suite 100
P.O. Box 12200
Jackson, WY 83001
Tel: (307) 264-0535/Fax: (571) 290-6052

*Attorneys for Plaintiff*

*Original electronically filed.*